IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 8, 2002

## STATE OF TENNESSEE v. MICHAEL WILLIAMS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 99-08306     J. C. McLin, Judge**

---

**No. W2001-01925-CCA-R3-CD  - Filed June 20, 2002**

---

The defendant, Michael Williams, was convicted of rape, a Class B felony, and sentenced to thirty years in the Tennessee Department of Correction as a violent offender. In his appeal, he argues that the evidence at trial was insufficient to support his conviction for rape. However, we disagree and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

A C Wharton, Jr., Shelby County Public Defender; Tony N. Brayton, Assistant Public Defender (on appeal); and Mary K. Kent, Assistant Public Defender (at trial), for the appellant, Michael Williams.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; William L. Gibbons, District Attorney General; and Patience Branham, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The victim, L.T.,[1] testified that she was 18 years old as of March 29, 1999, the day she was raped. That evening, she played basketball at the Greenlawn Gym in Memphis until around 9:30 p.m. and then walked to her mother's house on Georgia Street to pick up some money to buy diapers for her one-year-old son. L.T. then left her mother's house to walk home to her grandmother's apartment in the Foote Homes housing project, which was about thirty-five minutes away. She said

---

[1]It is the policy of this court to identify the victims of sexual abuse by their initials only.

that she had made this walk only two times before that evening, and described what occurred as she walked to her grandmother's apartment:

> A   I was coming from my mother's house.  I was going through the Cleaborn Home Development when him and another guy – they were behind me from the time I left out of my mother's house to the time I made it there, but I didn't pay it any attention cause it was like they were just walking behind me.  But once I –
>
> Q   I hate to interrupt you . . . [w]hen you said him, and you pointed somewhere, can you describe for the record where it was you pointed?
>
> A   Him with the blue shirt on with the ink pin [sic] up to his chin.
>
> MS. BRANHAM:  Your Honor, for the record she has identified Michael Williams, the defendant.
>
> THE COURT:  Let the record so state.
>
> Q   Did you know who he was?
>
> A   No.
>
> Q   Had you seen him before?
>
> A   No.
>
> Q   Did you know the other person?
>
> A   No.
>
> Q   Had you seen him before?
>
> A   No.
>
> Q   And what happened?  You can go back to where they were walking behind you.
>
> A   Once I got up – it's kind of like dark by this development – and once I got up there by this apartment, he walked in front of me.  [The defendant's] friend walked behind me and put the pistol right here to my neck.

-2-

Q   All right.  Now who put the pistol to your neck?

A   His friend.

. . . .

Q   All right.  And what happened then?

A   Then they took me in this abandoned house.

(Pause.)

Q   [L.T.], can you tell us what happened when you got in there?

A   Him and his friend raped me, man.

Q   Now, I'm sorry, but you're going to have to go into a little bit of detail?

A   I had on these pants, these jogging pants like the basketball players wear.  They come off.  They snap off real easy.  All you have to do is pull on them, and they come off.  And he pulled them off.

L.T. identified photographs of the exterior and interior of the abandoned apartment in the Cleaborn Homes housing project where the rape occurred.  She testified that the defendant and the other man grabbed her and pulled her into the back door and then into the kitchen.  The defendant told her not to scream.  The two men forced her down onto the kitchen floor.  L.T. described what happened next:

Q   Now, when they approached you there in the Cleaborn Projects, where they took to you [sic] to the house, what did they say to you?

A   They didn't say much of nothing.  You know, he just like grabbed me, like come on.  He took a necklace off my neck.  And then once we got in there, he snatched the pants off.  He went first and then his friend gave the gun to him and he held it and his friend raped me.

Q   All right.  Now, did both of them rape you?

A   Yes, ma'am.

Q   Now, when you say rape, tell me exactly what it is they did to you?

A   He took something he know [sic] he wasn't supposed to take because I wasn't giving it to him.

Q   And what did he do to you?

A   He had sex with me.

. . . .

Q   Did he enter your body in any way?

A   Yes.

Q   And how did he do that?

A   Like a person having sex, but he was kind of like forceful with it.

Q   Was this the private parts of his body?

A   With his penis.

Q   And what part of your body did he have sex with[?]

A   My vagina.

Q   Your vagina.  Did he – was there an ejaculation?

A   Yes.

Q   Now, what happened then?

A   Okay.  After his friend went into the living room area on the picture where I showed you all, he was like – like he turned his back.  When he got through, he was fixing ready [sic] to get up, I pushed him up off of me, and I ran out the door by these two dudes that was sitting up under the tree.  And they was asking me what's wrong with me because I was putting my pants back on, but I wouldn't tell them.  So they walked me to my grandmother's house because they knew my uncles.  They grew up with my uncles.

Once I got to my grandmother's house, I didn't tell my grandmother what happened; I didn't tell them what happened.  I

called a teacher of mine, who I talk to all the time. I told her what happened, and she told me to give the phone to my grandmother.

L.T. said she called her teacher, Gloria Taylor, and told her what had happened. She then gave the phone to her grandmother who called the police. That evening, she was questioned by the police about the rape and showed them the apartment where it had occurred. She then went to the Memphis Sexual Assault Resource Center ("MSARC"). About a week after the rape, she identified a photograph of the defendant while at police headquarters:

> Q    And what happened when you came downtown to look at the mug book?
>
> A    I was like – just like I was looking through it. And then I had saw [sic] his picture at first, but I didn't stop by because I wanted to be sure that that was him. So I went on through it, but then I turned the book back over and I went back through it again, and I seen the picture again. And I told the lady that was there that that was him. And she had me sign my initials by the picture.

L.T. testified that she did not voluntarily go with the two men she encountered on March 29, 1999, and she was scared because she thought they would kill her after they raped her. She kept "telling them to stop, but they wouldn't stop."

During cross-examination of L.T., defense counsel read aloud the statement L.T. gave to a detective about a week after the rape:

> Q    "[T]ell me in your own words what happened to you when you were walking on the east side of 591 Saint Paul?
>
> ANSWER: I had just come from my – over from my mother's house, and I was headed to my grandmother['s] house. These two guys had got behind me, one stepped in front of me and the other one, he grabbed me from behind and carried to [sic] the empty apartment where I was walking at. And once we got inside, both did what they did to me. The one with the gun pulled me in the house. The other guy came in the house and closed the door. And when they got inside, the light-skinned male [the defendant], he pulled my pants off and penetrated my vagina with his penis. And after he got up, the other male gave the gun to the light-skinned male, the dark-skinned one raped me. And then after the second one finished, I pushed him up and ran out the door where two guys were standing outside. And they asked me what had happened, and I told them that the two dudes

-5-

were after me. And they walked me home. I didn't tell them what just happened to me."

Defense counsel then asked L.T. why she had failed to mention in her statement that one of the men had stolen her necklace and why she had testified that the defendant was the second man to rape her but said in her statement to the police that the defendant was the first man to rape her. L.T. responded that she felt the necklace was not important and claimed that she told the detective taking her statement that the defendant was the second man to rape her. She said she did not read the statement before she initialed it.

Also, during cross-examination, L.T. said that she was not physically injured from the rape, that she did not know the defendant or the defendant's family, and that she had never called the defendant's mother. She denied that she agreed to have sex with the defendant for seven dollars.

Gloria Taylor testified that she was a special projects coordinator with the Memphis City Schools, and knew L.T. from when she participated in a GED program in 1998. Taylor said L.T. called her at about 11:00 p.m. on March 29, 1999, and said that she had been raped. L.T. said that she did not want to tell her grandmother or the police what had happened. Taylor said that although L.T. typically presented herself as a "hard girl" who could always take care of herself, she "knew something was wrong [when she got the phone call] because [L.T.'s] hardness wasn't there anymore." Taylor encouraged L.T. to tell her grandmother what had happened but did not, herself, inform L.T.'s grandmother because she felt it was "[L.T.'s] place to tell her grandmother." Taylor stated that L.T. said the next day that she had, in fact, told both her grandmother and the police about the incident.

Officer Jimmy L. Daniels of the Memphis Police Department Sexual Crimes Child Abuse Unit testified that he showed L.T. some mug books and took her statement. Daniels said that L.T. identified the defendant in one of the photographs and printed and signed her name and wrote the date and time on the back of the chosen photograph.

Patricia Speck, the coordinator of nursing services at the MSARC, testified as an expert in forensic nursing. She said that Nancy L. Miles, a nurse clinician who was out of the country at the time of the trial, had examined L.T. on the night of the rape. According to the information listed on L.T.'s sexual assault kit, Miles collected the following evidence: a dry blood standard, vaginal slides, pubic hair combings, two vulvar swabs, four vaginal swabs, and two saliva standard swabs. Speck said that L.T.'s vaginal slide indicated the presence of nonmotile sperm and that the report showed that L.T. had no trauma in the genital area. However, Speck explained that if L.T. had previously given birth to a child, she "would expect . . . less trauma because the tissue's already been stretched."

Margaret Aiken, a forensic nurse and sexual assault nurse examiner with the MSARC, identified the defendant as the suspect from whom she took a blood sample, putting it into the suspect's kit which she labeled and sealed.

-6-

Hyum Kim, a forensic scientist with the Memphis Police Department, testified that he collected evidence, consisting of the suspect's kit and the victim's kit and underwear, from MSARC's secured facility and forwarded it to the Tennessee Bureau of Investigation ("TBI") laboratory for DNA analysis.

Donna Nelson, a special agent/forensic scientist with the TBI, testifying as an expert in the field of serology, said that DNA testing revealed that the sperm found on L.T.'s vaginal swab belonged to the defendant. Following this testimony, the State rested its case in chief.

The defense's first witness was Mary Williams, the defendant's mother, who said that she talked to L.T. on the telephone approximately two months after the defendant was arrested. Williams said that L.T. identified herself as the woman her son had raped and promised to drop the charges in exchange for money. L.T. told her that two men had raped her, but she was only able to identify the defendant "because [he] was right in her face." On cross-examination, Williams admitted that she had never met L.T. before and did not recognize the voice on the phone as L.T.'s.

The defendant then testified, admitting that he had several prior convictions for robbery and burglary and had just finished serving his sentence on March 29, 1999, the day that L.T. said he raped her. He testified that he arrived home from prison at approximately 9:30 p.m. that evening and asked his mother for money to buy some "snacks." She gave him seven or eight dollars, and he left her house at about 10:00 p.m. to walk to a nearby Mapco store. En route, he saw two women walking down Vance Street. Thinking they were prostitutes, he approached L.T. and asked if she was "working" that night. He told L.T. that he could pay her only seven or eight dollars, and she eventually agreed to this price. He said that L.T. initially said they could go to a "little apartment," but because it was locked, they went behind Vance School instead. The defendant described his state of mind at the time he approached L.T.:

> So in my mind, I ain't fixing to give this girl no money. That's all, you know what I'm saying. Y'all can tell them I rub it in. I'm just being straightforward. I wasn't fixing to give her no money. My thing – I was – I'm fixing to deceive her and manipulate her. I'm just going to have sex with her.

The defendant testified that he and L.T. struggled over the money during and after the encounter, and he ultimately took the money from her shoe. Four months later, when he was arrested, he told the police, "I ain't never been no rapist. . . . I've been a robber . . . I burglarized . . . The issue is I didn't rape."

The defendant theorized that L.T. accused him of rape out of revenge: "People kill for – just for revenge. I grew up in the hood, so I know. . . . [S]he just went to the extent about revenge. I didn't have no – no remorse about taking seven dollars from her. So now she going to the – to the extreme."

The defendant also said that he voluntarily submitted to the DNA test, and that although he and L.T. had sex, he did not rape her:

> I'm just saying – I'm just saying – say [sic] ain't never give me no DNA test or nothing. They asked did I volunteer – I volunteered for what I told you for what I did. I was honest about what I did. I had sex with this girl. I never did rape or force or take nothing from her. I never did.
>
> Rape is by force. I know what rape is. I manipulated the girl out of something. Making her think that I was going to give her some money when I did give her the money, you know what I'm saying. I took the money back. As soon as she put it in her shoe, I took the money and told the girl to get up out of my face, you know what I'm saying. That's what I did.

The defendant said he had never met L.T. before March 29, 1999, and that he never saw her again after that day. He testified that he wrote L.T. from prison, apologizing for taking the seven dollars from her and offering for his mother to pay her.

## ANALYSIS

As his sole issue on appeal, the defendant argues that the evidence presented at trial was insufficient to support his conviction for rape. He says that his conviction was based only on the uncorroborated testimony of L.T., which was unreliable and contradictory: L.T.'s testimony that her teacher, Gloria Taylor, told her grandmother about the incident conflicted with Taylor's testimony that she had never spoken to L.T.'s grandmother about the incident; L.T. testified that the defendant was the second man to rape her while her written statement to the police stated that the defendant was the first of the two men to rape her; L.T. claimed that the living room window of the abandoned apartment where the rape occurred was not boarded up, but photographs show that the window was covered by a board; and L.T. stated that she was raped by two men in the apartment, yet, the vaginal swab contained DNA material belonging only to the defendant and L.T., rebutting her claim that a second man also raped her. Additionally, he argues that L.T. suffered no physical injuries and that there was no evidence in the vacant apartment to substantiate her claim that the defendant had been there or that a crime had been committed there.

Where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable

-8-

doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

Jury verdicts in criminal cases are given considerable weight by the reviewing court. A guilty verdict that is approved by the trial judge accredits the testimony of the State's witnesses and resolves all conflicts in favor of the theory of the State. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523, 527 (Tenn. 1963)). A guilty verdict removes the defendant's initial presumption of innocence and replaces it with a presumption of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

Tennessee Code Annotated section 39-13-503(a) defines rape as the following:

> Rape is unlawful sexual penetration of a victim by the defendant or of the defendant by a victim accompanied by any of the following circumstances:
>
> (1) Force or coercion is used to accomplish the act;
>
> (2) The sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent;
>
> (3) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or
>
> (4) The sexual penetration is accomplished by fraud.

Tenn. Code Ann. § 39-13-503(a) (1997). The defendant was indicted under Tennessee Code Annotated section 39-13-503(a)(1).

Taken in the light most favorable to the State, the proof showed that the defendant and an unidentified man forced L.T. into an abandoned apartment and raped her. As soon as L.T. arrived home, she called her teacher and told her what had happened. L.T. also notified the police that night, showed them the apartment were the rape occurred, and went to the MSARC, where evidence was collected for scientific analysis. At trial, L.T. identified the defendant as one of the men who raped her. Gloria Taylor, L.T.'s teacher, testified that she could tell that something bad had happened to L.T. when she called her on the evening of March 29, 1999, because L.T.'s attitude had completely changed. Patricia Speck of the MSARC testified that L.T. was examined on March 29, 1999, and that nonmotile sperm was collected from her for further analysis. Officer Jimmy Daniels of the Memphis Police Department testified that L.T. gave him a written statement and identified the defendant from the mug books. Margaret Aiken testified that she took a blood sample from the defendant with his consent. Donna Nelson, a TBI forensic scientist, performed DNA testing on the vaginal swabs from L.T. and the blood sample from the defendant, which showed that the defendant was the contributor of the sperm.

The defendant argues on appeal that, as a matter of law, this court should "discredit" the testimony of L.T. because it "was unreliable and contradicted other proof introduced by the State," citing examples to support this contention. However, providing details from the testimony of various witnesses to prove the alleged unreliability of the victim's testimony demonstrates that all of these seeming contradictions were put before the jury and available for its consideration in assessing the credibility of the witnesses. The defense fully ventilated the alleged contradictions in the victim's version of the facts. However, the jury resolved these conflicts against the defendant, as was their right. State v. Howard, 926 S.W.2d 579, 585 (Tenn. Crim. App. 1996) ("[D]efense counsel was permitted to develop the inconsistencies in the victim's testimony and challenge her credibility [and] [t]he jury's decision to accredit the victim's testimony was within their prerogative."). This court explained, in State v. Radley, 29 S.W.3d 532 (Tenn. Crim. App. 1999), the showing which must be made as to the testimony of a witness before the verdict of a jury may be altered:

> The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made. See State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993). Inconsistency, inaccuracy and omissions in the description of a defendant by a witness who is otherwise able to positively identify the defendant are questions for the jury to consider in determining the weight to be given the testimony. See generally State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Further, although inconsistencies or inaccuracies may make the witness a less credible witness, the jury's verdict will not be disturbed unless the

inaccuracies or inconsistencies are so improbable or unsatisfactory as
to create a reasonable doubt of the appellant's guilt.

Id. at 537.

Here, the victim positively identified the defendant as one of the men who had raped her. The several seeming contradictions in the State's proof are insufficient to create doubt as to the defendant's guilt of the offense. Accordingly, we respectfully disagree that the evidence was not sufficient to support the verdict of the jury.

## **CONCLUSION**

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE